1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**United States District Court**
For the Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

EDWARD V. RAY, JR.,

               Petitioner,

   vs.

MATTHEW CATE, Warden,

               Respondent.

_____/

No. C 10-01582 YGR (PR)

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

    This matter is now before the Court for consideration of Edward V. Ray's ("Petitioner") pro se Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254.  The court ordered respondent to show cause why the writ should not be granted.  Respondent filed an answer and a memorandum of points and authorities in support of it, and lodged exhibits with the court.  For the reasons set forth below, the Petition is DENIED as to all claims.  In addition, no certificate of appealability will be issued.

**BACKGROUND**

    On March 20, 2007, a jury found Petitioner guilty of 21 counts of robbery on 15 separate occasions between July 12, 2005, and August 27, 2006, *see* Cal. Penal Code § 211.  Respondent's Exhibit ("Resp. Exh.") A5 at 1095-1115, 1117.  On four counts, the jury found true the allegation that Petitioner personally used a firearm during the commission of the offense, and on two of those counts the jury also found true the allegation that Petitioner personally inflicted great bodily injury, *see* Cal. Penal Code §§ 12022.53(b), 12022.7.  Resp. Exh. A5 at 1106-07, 1111-12.  On April 17, 2007, the court sentenced Petitioner to an aggregate term of 38 years and four months in prison.  Resp. Exh. H

United States District Court

For the Northern District of California

at 2.  On November 23, 2009, the California Court of Appeal affirmed the judgment.  Resp. Exh. H, *People v. Ray, Jr.*, 2009 WL 4023678 (Cal. App. 1 Dist.).  Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal, which was denied on November 23, 2009.  Resp. Exh. I, L.  On March 10, 2010, a petition for review of the Court of Appeal's decision on direct appeal, and a petition for writ of habeas corpus were both summarily denied by the California Supreme Court.  Resp. Exh. M, N.

The facts relating to Petitioner's convictions, as described by the California Court of Appeal, are as follows:

Between July 12, 2005, and August 27, 2006, the Ray family (immediate and extended) engaged in a prolific and profitable enterprise robbing a variety of establishments, primarily convenience stores, in Oakland, Alameda, and Hayward. Their entrepreneurial effort came to an abrupt halt on August 27, 2006, when both Ray Jr. and Ray III were apprehended fleeing the scene of what proved to be their last robbery-a 7-Eleven store at 2411 MacArthur Boulevard in Oakland.  The operation further unraveled when Ray III, in an apparent lack of filial devotion, gave a detailed statement to the police chronicling the family exploits and the role of his father, his sister Melissa, and her boyfriend Carrington in the various robberies.  Finally, Carrington accepted a plea bargain and testified against both Ray Jr. and Ray III at trial.  The offenses, and the evidence relating to each count, are outlined here in chronological order.

*Counts 2 and 3-Robberies of Allen Kung and Christina Miller at Longs Drugs in Oakland on July 12, 2005 [Ray Jr. and Ray III]*

The first chapter in this crime spree began on July 12, 2005, at a Longs Drugs located at 51st Street and Broadway in Oakland (counts 2 & 3).  Allen Kung was the manager of the store and Christina Miller was a cashier.  At about 11:50 p.m., three persons entered the store, wearing masks and gloves.  Kung described one individual as about six feet tall and skinny-about 150 pounds, wearing a grey hooded sweater.  Kung could tell by the individual's voice that he was a man, and he could see through the openings in the mask that the man was Caucasian.  The second person was about five feet five inches tall, and wearing all black (Ray Jr. is approximately five feet nine inches or five feet ten inches tall).  Kung believed from the person's voice that the second individual also was male.  The shorter robber carried a nine-millimeter handgun.

The taller robber pointed a gun at Christina Miller, demanding that she open the safe or he would kill her.  He ordered Kung to open the safe and also what the robber referred to as the "Reno Box ."  The "Reno box" was a box into which cashiers would deposit large denomination currency.  Store cashiers were familiar with this term.  Kung removed the money from the "Reno box," from the change box, and from the safe, dropping it into a duffel bag held by the shorter robber. Kung estimated the loss at $50,000.

The robbery was captured on surveillance video.  In his post-arrest statement, Ray III stated that he had committed this robbery (as well as one other uncharged offense) with "Ozell," a friend whose last name he did not know.

2

*Counts 5 and 6-Robberies of Sandeep Kumar and Kuldip Sekhon at the 7-Eleven Store on Harrison Street in, Oakland on April 18, 2006 [Ray Jr. and Ray III]*

On April 18, 2006, Sandeep Kumar and Kuldip Sekhon were working at the 7-Eleven store at 2350 Harrison Street, Oakland.  At about 1:45 a.m., two men arrived in a silver colored Honda (observed on surveillance video) and entered the store.  Both wore dark sweatshirts and had their faces covered.  One was about five feet seven inches tall, and the other a little taller.  One had a small silver gun.  Both victims were ordered behind the register, and Kumar was forced to open the register.  The robbers took the cash trays with money, lottery tickets and cigarettes.

*Counts 8 and 9-Robberies of Frezghi Tesfamicheal and Darshan Singh at the 7-Eleven Store on 41st and Broadway in Oakland on April 24, 2006 [Ray Jr. and Ray III]*

On April 24, 2006, at about 1:30 a.m., Frezghi Tesfamicheal and Darshan Singh were working as clerks at the 7-Eleven store at 41st and Broadway in Oakland.  Two men exited a small silver car and ran into the store.  One man, wearing a black hooded sweatshirt, with his lower face covered, pointed a gun at Tesfamicheal and told him not to move.  He was about five feet seven inches tall, and Tesfamicheal believed that the man was White from the area of his eyes that Tesfamicheal could see.  The second robber was taller, about six feet two inches tall, wearing a grey sweatshirt, and seemed to be slightly older than the gunman.  The gunman ordered Singh to open the cash register, and made both Tesfamicheal and Singh face the wall near the register.  The men took cash from the register, although Tesfamicheal did not know how much, and cigarettes.

*Count 11-Robbery of Sandeep Kumar at the 7-Eleven Store on Harrison Street in Oakland on April 29, 2006 [Ray Jr. and Ray III]*

On April 29, 2006, at about 3:25 a.m., Sandeep Kumar and Kuldip Sekhon were again working at the 7-Eleven store at 2350 Harrison Street, Oakland. Two men, similar to the two who had earlier robbed the store, entered wearing sweatshirts with hoods and cloths covering their lower faces.  One had a small silver gun.  Kumar was ordered to open the cash register and to surrender the money.  The robbers also took cartons of cigarettes.

There was surveillance video of the robbery. Carrington identified the taller of the two robbers shown on the video as Ray III and the other as Ray Jr.  Ray III admitted to police robbing this 7-Eleven store twice in April, and said that he carried a plastic gun both times.

*Count 12-Robbery of Nicholas Becker at Walgreens Drugstore at 34th Street and Telegraph Avenue in Oakland on May 13, 2006 [Ray Jr. and Ray III]*

On May 13, 2006, at about 10:00 p.m., the Walgreens at 34th Street and Telegraph Avenue was closing for the evening.  Nicholas Becker was the assistant manager.  Becker was at the door waiting for the last customers to leave when he saw a grey Toyota or Honda pull up quickly.  A man with a gun exited and ran toward Becker.  He described the gunman as about six feet tall and weighing 150-160 pounds, wearing a black sweatshirt with a hood, and with his face covered with a red bandana.  From the facial area he could observe, Becker could tell that the gunman was White.  A second man, shown on surveillance video, entered the store behind the gunman.

3

Becker was first forced to the floor and then walked to the cash register at gunpoint when a clerk was unable to open the register.  The robbers took the entire till from the register with about $700.  The second robber took packages and cartons of cigarettes from the area of another register.

From the surveillance video, Carrington identified Ray Jr. as the person holding a gun to Becker's head and Ray III as the second robber.

*Count 14-Robbery of Melisew Ayenew at the 7-Eleven Store at 41st and Broadway in Oakland on May 25, 2006 [Ray Jr. and Ray III]*

On May 25, 2006, at about 11:24 p.m., Melisew Ayenew was working as a clerk at the 7-Eleven store at 4100 Broadway, Oakland when two men entered with their faces partially covered and told everyone in the store not to move.  One of the robbers jumped the counter and took money from an open register.  The other pointed a pistol in Ayenew's face, demanding that he open another register, and striking him in the face with the pistol and kicking him when he protested that it was broken.  The blow drew blood.  The robbers took money from under the register that Ayenew pointed out and cigarettes.  Ayenew could see that one of the robbers was White, but could not see the face of the other.

Carrington again viewed a surveillance video of the robbery and identified Ray Jr. as the individual wearing a black hoodie and "army pants" and Ray III as the person behind the register wearing a grey hooded sweatshirt.  Ray III told police that he had robbed this store two or three times using a plastic BB gun, but denied hitting anyone.

*Count 15-Robbery of Jose Hernandez at Round Table Pizza in Alameda on May 28, 2006 [Ray Jr. and Ray III]*

On May 28, 2006, Jose Hernandez was the manager of the Round Table Pizza at 2611 Blanding Avenue, Alameda.  The store, which was doing pickup and delivery business only, was in a temporary trailer in an isolated area.  At about 9:30 p.m., after the restaurant had closed, Hernandez was sitting with friends in a back patio area when two men walked through the gate wearing dark clothes, with hoods over their heads and blue and red bandanas on their faces.  One had a chrome handgun pointed at Hernandez.  Hernandez was forced inside the trailer and made to open the safe.  The robbers took two day's worth of receipts, consisting of eight bundles of currency.  Hernandez described the gunman as between five feet eight inches and five feet ten inches tall, with blue eyes.  The second man was a little taller, and thin.  Hernandez identified Ray Jr. as someone he had seen before in the area of the business.

Ray III, in his statement to police, said that he had robbed a Round Table in a trailer in Alameda near the Fruitvale Bridge.  He claimed that he had a plastic gun, and that he took about $1,000.

*Counts 16 and 17-Robberies of Yong Kim and Stephen MacManus at South Shore Liquor Store in Alameda on June 23, 2006 [Ray Jr. and Ray III]*

On June 23, 2006, at 9:30 p.m., two men wearing hoods and masks entered the South Shore Liquor store, located in the South Shore Center in Alameda.  The owner, Yong Kim, was working at the cash register.  Stephen MacManus was a customer.  The taller of the two men held what Kim described as a long black gun and MacManus described as a shotgun with a black barrel and a dark brown stock.

4

The man wore a black sweatshirt with the hood pulled up and a red bandana over his lower face.  He was about six feet tall, and both Kim and MacManus could tell that he was White.  The second man was shorter and held a grey or silver handgun.  He wore a grey hooded sweatshirt with the hood pulled up, and a blue bandana over the lower part of his face.

The taller man pointed the shotgun at Kim and repeatedly demanded that he open the register.  Kim gave the man the entire cash drawer containing about $700.  The man with the shotgun then pointed it at MacManus and demanded his wallet.  MacManus complied.  MacManus looked at the face of this robber for about five to ten seconds, from a distance of about three feet.  He could see the eyes, forehead, and some of the hair, which he said was sandy brown.  He identified Ray Jr. in court as the man with the shotgun based on his complexion, the shape of his face, the area around his eyes, the color of his hair, and his height.  He said that the build and general body shape of Ray III were consistent with the man with the handgun.  In separate police lineups, MacManus had been unable to identify either Ray Jr. or Ray III.

Ray III admitted to police that he had robbed South Shore Liquor while wearing a hoodie and a bandana, and said that he had used a plastic handgun.

*Counts 18 and 19-Robberies of Seara Tesfamariam and Yash Hampaul at the 7-Eleven and 41st and Broadway in Oakland on June 30, 2006 [Ray Jr. and Ray III]*

On June 30, 2006, at about 4:00 a.m., two men with guns entered the 7-Eleven at 4100 Broadway in Oakland and told the clerk, Seara Tesfamariam, not to move.  Both men wore black coats, blue jeans, and ski masks.  One man was taller than Tesfamariam, who was five feet five inches tall, and the second man was taller than the first.  The taller of the two men jumped the counter and told "Yosh," another clerk in the store, to open the register.  He opened the register at gunpoint and the robbers took the money.  They also took lottery tickets and cigarettes.  Police located a Honda Civic abandoned about five minutes away in the 2800 block of Webster Street with the engine still running, and with the steering column and right rear window broken.

Carrington was unable to identify anyone from the surveillance video.  This was the store that Ray III admitted robbing two or three times.

*Count 20-Robbery of Joseph Adkins at Walgreens in Alameda on July 6, 2006 [Ray Jr. and Ray III]*

On July 6, 2006, at 4:49 a.m., two armed men entered the Walgreens drugstore in the South Shore Shopping Center in Alameda.  They were wearing black hooded sweatshirts, and had handkerchiefs covering the lower part of their faces.  The shorter of the two men carried a shotgun, possibly sawed off, and the other had what assistant manager Joseph Adkins described as a Glock nine-millimeter handgun.  The man with the shotgun forced Adkins to the registers and threatened to "blow [his] fucking head off" when Adkins had difficulty with his password.  Once Adkins was able to open the register, the man grabbed the cash drawer which contained about $300.  The second robber jumped over the counter at another register and took cigarettes.  Adkins believed the robbers to be White or Hispanic.

Shortly after the time of the robbery, at about 5:00 a.m., Alameda police found a black Honda Civic about 300 yards from the Walgreens, abandoned with the

engine running and the ignition tampered with.

Carrington identified Ray III as one of the two robbers shown in the surveillance video, but "c[ould]n't say" who the other was. Carrington denied that he was the second robber, noting that this man wore "army pants," and that he never wore such pants.

Ray III told police that he had robbed the Walgreens in South Shore in Alameda, driving there in a stolen Honda Civic. He wore a hoodie, with a blue and white bandana on his face, a took about $200 and cartons of cigarettes.

*Count 22-Robbery of Francis Shelley at the 7-Eleven Store on 23rd Avenue in Oakland on July 10, 2006 [Ray Jr. and Ray III]*

On July 10, 2006, at 6:00 a.m., Francis Shelley was a customer in the 7-Eleven store at 324 23rd Avenue, Oakland. Two men entered, one with a gun, which Shelley described as a short-barrel shotgun. The clerk, Rita Thapa, described the gunman as about six feet tall and thin, wearing a sweatshirt, and with a dark blue or black handkerchief covering his lower face. The second person was shorter and wore a hooded sweatshirt. Both wore wrap-around sunglasses. Thapa thought both were Black. Shelley thought the gunman was Hispanic or Black, but could only see a small sliver of skin between the cheekbone and the sunglasses. Thapa was ordered to open the register and did so.

The gunman demanded Shelley's wallet, which was on the counter. When Shelley resisted the gunman struck him in the forehead with the weapon, drawing blood and gashing the skin to the bone, and knocking him to the floor. The robbers fled with the register cash drawer and with Shelley's wallet.

Shelley ran outside and saw the two men enter what he described as a burgundy front-wheel drive Japanese car, which a third person was driving. He was later taken by police to a location across from 527 23rd Avenue, near the Park Street Bridge to Alameda, where he identified a red Honda as the getaway car. The car had been found abandoned, with the engine running, no key in the ignition, and the ignition and steering column tampered with.

Shelley was taken to the hospital by ambulance for treatment of his wound. The wound required packing and stitches, and left a visible scar.

Ray III admitted to police that he had robbed the 7-Eleven store on 23rd Avenue.

*Count 23-Robbery of Andy Truong at AM/PM Market on Park Street in Alameda on July 18, 2006 [Ray Jr., Ray III and Carrington]*

On July 18, 2006, at approximately 5:24 a.m., Andy Truong was stocking merchandise in the AM/PM Market at 1260 Park Street, Alameda. Three men entered the store, one with a shotgun and another with a handgun. The man with the shotgun was wearing a hooded sweatshirt, gloves and a red bandana. Truong described him as White, in his 30s, and about five feet seven and one-half inches tall. The second gunman was younger, also White, and about seventeen or eighteen years old. The surveillance video showed that the man had his face covered with a blue bandana, although Truong did not recall this. The third person was a tall Black man.

The robber with the shotgun repeatedly ordered Truong to open the register, saying

6

United States District Court

For the Northern District of California

"open the fucking register," but Truong was unable to do so. He gave them a four digit code which failed to work, but they were ultimately able to open the register using the first two digits. They took the money. Before they left the older man with the shotgun said, "You lied to me," and struck Truong in the head with the shotgun. Truong suffered a bleeding wound requiring eight staples to close.

Carrington testified that he committed the robbery with Ray Jr. and Ray III. He said that Ray Jr. had a shotgun, Ray III had a toy gun or a knife, and that he carried a toy shotgun. They drove to the scene in a stolen Honda. He saw Ray Jr. hit the Asian store clerk in the head with the shotgun before they left. Carrington identified Ray Jr. on photographs from the surveillance video as the person with the shotgun, and Ray III as the person at the register wearing the light blue bandana. He also identified himself on the tape. Ray Jr., giggling and laughing, later showed Carrington a newspaper article about the robbery mentioning the fact that the clerk required stitches. Ray Jr. appeared excited that he had made the papers.

During his police interview, Ray III was shown the surveillance video and identified himself and Carrington on the tape. They drove to the location in a stolen Honda, and took money and cigarettes.

The surveillance video also recorded the demands by the person with the shotgun that Truong "open the fucking register." Although Ray Jr. denied in his testimony that it was his voice on the tape, the video was played for the jury and the prosecution argued that Ray Jr.'s distinctive regional accent could be identified on the recording.

*Count 25-Robbery of Issa Abdul-Kareem at the 7-Eleven Store at 4720 MacArthur in Oakland on August 1, 2006 [Ray Jr. and Ray III]*

On August 1, 2006, at 3:55 a.m., two men with masks entered the 7-Eleven store at 4720 MacArthur Boulevard, Oakland. The clerk, Issa Abdul-Kareem, could tell from what skin area he could see that both were White. He said both were young, between 25 and 30 years old, and he described one as about five feet ten inches tall and 150 pounds. They talked to each other during the robbery "like family." One man had a gun and the other a knife. With both the gun and knife pointed at him, Abdul-Kareem opened the cash register and the men took the money from it. One of the men also took beer. He saw them flee in a newer Honda Civic. Police located the car about a block away with the motor running and the driver's door open.

The robbery was captured on surveillance video. Ray III admitted to a robbery of a 7-Eleven store "over by Seminary" about August 1st in which he used two stolen cars, and in which he used a knife.

*Counts 26 and 27-Robberies of Alan Rodrigues and Annica Henderson at the 7-Eleven Store on Aldengate Way in Hayward on August 8, 2006 [Ray Jr., Ray III, and Carrington]*

On August 8, 2006, at 4:11 a.m., Alan Rodrigues was just leaving the 7-Eleven store on Aldengate Way in Hayward when three men with masks jumped out of a car parked behind Rodrigues's truck. They ordered him back into the store at gunpoint, with what he thought was a rifle. He described the man with the rifle as White and about five feet ten inches to six feet tall. This robber demanded Rodrigues's wallet, while the other two went behind the counter and opened the

cash register. They left with money and beer.

Annica Henderson was also a customer inside the store when she saw the three robbers enter. One of the men, carrying what she thought was a small shotgun, demanded her wallet. She did not have one, but gave him $20. She described the person who took her money as the tallest of the three, about five feet eleven inches or six feet tall, with a thin build, wearing a pullover sweatshirt, and with a bandana covering his nose and mouth. She believed he was African-American. She described one of the other two as between five feet six inches and five feet eight inches tall, wearing a light colored hooded sweatshirt and a dark bandana, and carrying a knife. She could see from the skin around his eyes that he was Caucasian. The third robber, standing next to the other customer, was about five feet eight inches or taller, wearing a dark pullover sweatshirt and a bandana on his face. She thought he was African-American.

The robbery was captured on surveillance video. Carrington testified that he, Ray Jr. and Ray III went to the store in a stolen Honda. He identified Ray Jr. as the person wearing a black hoodie and camouflage pants. He identified himself behind the register wearing a blue jacket, and Ray III as the person next to him, wearing a beanie cap with the word "Oakland" on it. Ray III described to police a 7-Eleven robbery in Hayward in which they had forced a customer back into the store. He identified himself from still photos taken from the surveillance video wearing a black knit cap with the words "Oakland 510 bound" on it, and Carrington wearing a skateboard coat. He also identified a photo of Rodrigues as the person they had forced back into the store.

*Count 1-Robbery of Ved Goyal at the 7-Eleven Store on 2411 MacArthur Boulevard in Oakland on August 27, 2006 [Ray Jr. and Ray III]*

On August 27, 2006, at about 12:55 a.m., Ved Goyal and Mangit Singh were working at the 7-Eleven store at 2411 MacArthur Boulevard, Oakland. Two men entered the store wearing masks. One grabbed Goyal and took him toward the cash register. Singh described one man as taller, about six feet tall, and the other as shorter, about five feet seven inches or five feet eight inches tall. Singh thought the taller man was Black, and the shorter man was White. The taller man had a gun and demanded that Goyal open the register. The two men took the cash tray from the register and put it in a bag. The men also took a set of keys, and the man with the gun took a carton of cigarettes. The men ran to a car parked sideways in the parking lot.

Oakland Police Officer Christopher Saunders was driving past the 7-Eleven store at about 12:55a.m., when he saw three men run from the store, one with his hands up. Two of the men ran to a green Honda Civic in the middle of the store's parking lot. One had a red bandana over his face and the other wore a blue and black windbreaker jacket with the hood pulled up. Both were White. Saunders ordered the men to stop at gunpoint, but they entered the car and fled from the scene with the officer in pursuit.

After a high speed chase for about four miles, Saunders was able to force the Honda into a spin on East 12th Street, near Third Avenue. Ray Jr. was removed from the driver's seat and Ray III from the passenger seat. Saunders had to break open the passenger window to forcibly remove Ray III from the vehicle. Ray Jr. resisted arrest and officers used a Taser to subdue him. Ray Jr. was photographed wearing a dark blue shirt with an Oakland Raiders logo, and Ray III was wearing a blue and black hooded jacket. Ray Jr. was wearing gardening gloves on both

hands when arrested.

The cash register drawer with money was on the back seat of the Honda, and a carton of cigarettes was on the front passenger floorboard. A red bandana was found between the driver's seat and the door. Also recovered from the car were gloves, a beanie cap with an Oakland Raiders logo, and a plastic toy gun with a portion of the butt broken. The ignition on the steering column of the vehicle had been punched out.

*Search of the Ray's Recreational Vehicle*

Acting on information provided by Ray Jr. following his arrest, a white RV/van with a stripe on the side belonging to the Ray family was located at 65th Street and Telegraph Avenue in Oakland in the early morning hours of August 27, 2006. Ray Jr.'s wife, Tina Ray, Melissa and a younger daughter were contacted in the RV. A search warrant for the RV was obtained, and police recovered camouflage pants, gloves, a box for a replica handgun with a laser sight, black baseball caps with Raider emblems, and computer printouts and hand-written notes and diagrams on how to hotwire vehicles. A Honda Civic with a punched ignition was located less than a block away from the RV.

*Ray III's Statements to Police.*

As discussed above, Ray III gave a statement in which he admitted involvement in the series of robberies. He said that he typically wore a hat and a bandana in the robberies, and frequently wore a hoodie and gloves. He said that toy guns were usually used, and denied using a real gun. He admitted, however, that there was a single barrel shotgun with a pistol grip that "maybe" was used in one of the robberies. On the day of the last 7-Eleven robbery he had stolen two Honda Civics, as he usually did. Melissa was waiting in the second stolen Honda one street away.

*Ray Jr.'s Statements to Police*

While being transported to the hospital after being tasered during his arrest, Ray Jr. said to the transporting officer "[a]ll you got me on is a 211" and "I know who you're looking for. I read the papers. You guys have been betting on who is going to get us." During the ride to the hospital, Ray Jr. had removed the gloves he had been wearing, and they were found in the rear seat of the patrol car. When transported that same evening from the hospital to the police station, Ray Jr. said "I know I'm a bad example for a father. I'm worried about my son for getting him involved. I know this is a bad one. How much time do you think I'll get for this one?"

Ray Jr. was interviewed by detectives on August 27, 2006, at 10:57 p.m. He said that he lived in the RV with his wife and three children, including Ray III and Melissa. In the recorded portion of the interview, he admitted committing the 7-Eleven robbery for which he had been apprehended, saying that he had entered the store wearing his black Raider's shirt and a red "scarf" on his face, carrying a toy gun, and that he "went for" the register. After the recording was turned off, he further stated that he was responsible for some, but not all of the other robberies, that "people" in an area where he used to live on Pearl Street in Oakland were "framing" him, and that he had an alibi

*Evidence of Ray Jr.'s Post-Arrest Conduct*

9

On February 21, 2007, prior to his trial testimony, Carrington was inadvertently placed in a holding cell with Ray Jr. and other inmates.  Ray Jr. told other inmates that Carrington was "snitching" and as a result, Carrington was assaulted by another inmate.  Ray Jr. told Carrington not to testify.

At the time of the preliminary hearing on November 1, 2006, Ray Jr. was searched and a note was found in his sock.  The note, which was read to the jury during cross-examination of Ray Jr. at trial, appeared to be directed to Ray III: suggesting that Ray III confess; promising money to Ray III if he got out; and saying, "If you do take this, I will owe you forever."  Ray Jr. denied writing or reading the letter, and said that someone had handed it to him on the prison bus.

*Ray Jr.'s Trial Testimony.*

Ray Jr. testified, denying involvement in any of the robberies, including the 7-Eleven robbery where he was arrested fleeing the scene.  He said that he went to the 7-Eleven that night to pick up Melissa.  Melissa jumped into the car with a brown paper bag.  Ray Jr. started to enter the store when Carrington almost knocked him down running out.  He and Ray III then ran to the car and he fled from the police because he knew the car that they were driving was stolen. Melissa and Carrington fled separately.  He denied having the toy gun found in his car, said that he was wearing a bandana around his neck (and not on his face) because it was "chilly," and said that the garden gloves he was wearing were his "driving gloves ."  He denied confessing to the robbery, and said that he had not mentioned Carrington to police after his arrest because Carrington was at large and he feared for his family.  He insisted "... as I [have] stated numerous times[,] I'm a law abiding citizen.  I have no prior offenses.... I've never been convicted of any drug offense or anything.  I had a minor alcohol problem which I have canned by taking classes.  Other than that, I don't have a record."  On cross-examination he denied physically assaulting his daughters, having smoked crack cocaine, or telling police officers that he had smoked crack cocaine and marijuana in front of his children. He admitted that he had been charged with public drunkenness and disorderly conduct, charged with aggravated assault on Tina Ray in Pennsylvania, and that he had been put on probation for simple assault on Tina as a result in what he termed as "drunken melee."  He insisted, however, that "I'm not a violent person."

Officer James Saleda of the Oakland Police Department testified in rebuttal. Saleda interviewed Ray Jr. in custody on March 8, 2001, in connection with an investigation for physical abuse of his daughter, Melissa.  In that interview Ray Jr. admitted to striking his wife and two of his daughters, and smoking both crack cocaine and marijuana in his house.

*The Verdicts*

Two charged counts against Ray Jr. and Ray III (counts 10 & 21) were dismissed by the court on the District Attorney's motion at the close of the prosecution evidence (§ 1118.1).  On March 20, 2007, a jury convicted Ray Jr. of 21 counts of second degree robbery as charged (§ 211; counts 1-3, 5, 6, 8-9, 11-12, 14-20, 22-23, 25-27) and found true allegations that he personally used a firearm in the commission of four of the robberies (§§ 12022.5, 12022.53, subd. (b); counts 16-17, 22-23), was armed with a firearm in the course of four offenses (§ 12022, subd. (a)(1); counts 2-3, 26-27), and that he inflicted great bodily injury in two instances (§ 12022.7; counts 22-23).

10

**United States District Court**

For the Northern District of California

1     *Sentencing*

2     On April 17, 2007, Ray Jr.'s motion for new trial, motion to set aside the verdict,
and motion to dismiss the weapons enhancements were all denied. He was found

3     to be ineligible for probation by virtue of the firearm use enhancements, and
sentenced to an aggregate term of 38 years 4 months in state prison. He filed a

4     timely notice of appeal on that date.

5     Resp. Exh. H at 3-23 (footnotes omitted).

6     **STANDARD OF REVIEW**

7     A district court may not grant a petition challenging a state conviction or sentence on the basis

8 of a claim that was reviewed on the merits in state court unless the state court's adjudication of the

9 claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of,

10 clearly established Federal law, as determined by the Supreme Court of the United States; or

11 (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the

12 evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). The first prong applies both

13 to questions of law and to mixed questions of law and fact, *see Williams (Terry) v. Taylor*, 529 U.S.

14 362, 407-09 (2000), while the second prong applies to decisions based on factual determinations. *See*

15 *Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

16     A state court decision is "contrary to" Supreme Court authority, that is, falls under the first

17 clause of § 2254(d)(1), only if "the state court arrives at a conclusion opposite to that reached by [the

18 Supreme] Court on a question of law or if the state court decides a case differently than [the

19 Supreme] Court has on a set of materially indistinguishable facts." *Williams (Terry)*, 529 U.S. at

20 412-13. A state court decision is an "unreasonable application of" Supreme Court authority, falling

21 under the second clause of § 2254(d)(1), if it correctly identifies the governing legal principle from

22 the Supreme Court's decisions but "unreasonably applies that principle to the facts of the prisoner's

23 case." *Id.* at 413. The federal court on habeas review may not issue the writ "simply because that

24 court concludes in its independent judgment that the relevant state-court decision applied clearly

25 established federal law erroneously or incorrectly." *Id.* at 411. Rather, the application must be

26 "objectively unreasonable" to support granting the writ. *Id.* at 409.

27     Under 28 U.S.C. § 2254(d)(2), a state court decision "based on a factual determination will

28 not be overturned on factual grounds unless objectively unreasonable in light of the evidence

**United States District Court**
For the Northern District of California

1    presented in the state-court proceeding." *See Miller-El*, 537 U.S. at 340; *see also Torres v. Prunty*,

2    223 F.3d 1103, 1107 (9th Cir. 2000).

3        When there is no reasoned opinion from the highest state court to consider the petitioner's

4    claims, the court looks to the last reasoned opinion. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801-06

5    (1991); *Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).  Thus, a federal court will

6    "look through" the unexplained orders of the state courts rejecting a petitioner's claims and analyze

7    whether the last reasoned opinion of the state court unreasonably applied Supreme Court precedent.

8    *See Ylst,* 501 U.S. at 804-06.  However, when presented with a state court decision that is

9    unaccompanied by a rationale for its conclusions, a federal court must conduct an independent review

10    of the record to determine whether the state-court decision is objectively unreasonable.  *See Delgado*

11    *v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).  This review is not a "de novo review of the

12    constitutional issue;" rather, it is the only way a federal court can determine whether a state-court

13    decision is objectively unreasonable where the state court is silent.  *See Himes v. Thompson*, 336 F.3d

14    848, 853 (9th Cir. 2003).  "[W]here a state court's decision is unaccompanied by an explanation, the

15    habeas petitioner's burden still must be met by showing there was no reasonable basis for the state

16    court to deny relief." *See Harrington v. Richter*, 131 S. Ct. 770, 784 (2011).

17                              **DISCUSSION**

18        As grounds for federal habeas relief, Petitioner asserts the following claims: (1) statements

19    were used at trial that were obtained without a proper *Miranda* warning having been given; (2) his

20    Sixth Amendment right to counsel was violated when a videotaped lineup was held at which counsel

21    was not present; (3) his speedy trial rights under the Sixth Amendment were violated because trial

22    was not held within 60 days; (4) he is actually innocent in the "string of takeover robberies" in

23    Oakland; (5) the prosecutor committed misconduct in several different ways; (6) his Fourteenth

24    Amendment rights were violated by the imposition of sentence enhancements that were not supported

25    by the evidence; (7) the failure to sever his trial from that of a co-defendant, and the use of the co-

26    defendant's statement violated his Sixth Amendment right to confront witnesses; (8) trial counsel was

27    ineffective in several different ways; (9) appellate counsel was ineffective for failing to raise several

28    issues on appeal; (10) the appellate court judge "changed testimony given during trial"in the appellate

1 opinion; (11) the trial court's use of modified CALCRIM No. 3515 over his objection violated his
2 right to due process; (12) the trial court erred by failing to instruct the jury on the law of accomplices;
3 (13) the evidence was insufficient to support the conviction; (14) the improper admission of opinion
4 testimony violated his right to a fair trial; (15) his statements made to police were involuntary and
5 coerced; and (16) his sentence amounts to cruel and unusual punishment. Petition for Writ of Habeas
6 Corpus ("Hab. Pet.") at 7-45.

7        The court found that Petitioner failed to exhaust state court remedies for claim 2, portions of
8 claims 6, 7, and 8, and claim 13, and dismissed claim 4 because it was not cognizable in federal
9 habeas, and, at Petitioner's request, dismissed portions of claims 8, 12, and 14. Order, April 15,
10 2011. Petitioner elected to proceed with only the exhausted claims. Order, April 18, 2012.
11 Accordingly, Petitioner's claims 1, 3, 5, 6 (in part), 7 (in part), 8 (in part), 9, 10, 11, 13 (in part) 15,
12 and 16 will be addressed on the merits.

13 **I.    *Miranda* Violation**

14        Petitioner claims that the prosecution's use of statements he made in the police car while
15 being transported to the hospital, and from the hospital to the police station, violated his
16 constitutional rights because he was not given his *Miranda* warnings. Hab. Pet. at 7.

17        **A. Factual Background**

18        Petitioner was arrested following a high speed chase with police after robbing a 7-Eleven in
19 Oakland. Resp. Exh. H at 19-20. At trial, Oakland police officer Martin Ziebarth testified that at the
20 scene of the arrest, he handcuffed Petitioner, placed him in the patrol car, obtained his name and date
21 of birth, and drove him to the hospital. Resp. Exh. B6 at 966. On the way to the hospital, and later
22 from the hospital to the police station, Petitioner "would not stop talking," and made several
23 potentially incriminating statements that were documented by Officer Ziebarth in a supplemental
24 report, as described in the California Court of Appeal's opinion. *Id.* at 968-71, 984-88, Exh. H at 21.
25 Officer Ziebarth further stated that the conversation was "one-sided," and that in conversing with
26 Petitioner he was not trying to elicit any incriminating responses, but just "let him talk." *Id.* at 988-
27 90.

28 ///

United States District Court
For the Northern District of California

**B. Legal Standard**

In *Miranda v. Arizona*, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. *Miranda* and its progeny govern the admissibility of statements made during custodial interrogation in both state and federal courts. *Id.* at 443-45. *Miranda* requires that a person subjected to custodial interrogation be advised that "he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney." *See Miranda*, 384 U.S. at 444. The warnings must precede any custodial interrogation, which occurs whenever law enforcement officers question a person after taking that person into custody or otherwise significantly deprive a person of freedom of action. *Id.*

*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent, and also applies to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response. *See Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980); *see also Cox v. Del Papa*, 542 F.3d 669, 676-77 (9th Cir. 2008) (finding it proper to deny suppression of defendant's spontaneous, unsolicited, and unprompted remarks made while in custody, because *Miranda* applies only when a suspect is subjected to interrogation).

The requirements of *Miranda* are "clearly established" federal law for purposes of federal habeas corpus review under 28 U.S.C. § 2254(d). *See Juan H. v. Allen*, 408 F.3d 1262, 1271 (9th Cir. 2005); *Jackson v. Giurbino*, 364 F.3d 1002, 1009 (9th Cir. 2004).

**C. Discussion**

Petitioner's claim lacks merit. The record is completely devoid of any evidence that would demonstrate that Officer Ziebarth, while transporting Petitioner, was trying to elicit any incriminating statements. Likewise, Petitioner offers nothing to support a finding that his statements were the product of interrogation, rather than spontaneous, unsolicited remarks. After an independent review of the record, the court finds that the state court decision denying Petitioner's claimed *Miranda* violation was not objectively unreasonable. *See Delgado*, 223 F.3d at 982.

**United States District Court**
For the Northern District of California

14

**II.    Speedy Trial**

Petitioner claims that his Sixth Amendment right to a speedy trial was violated because his trial began after the 60-day limit established by California state law.  Hab. Pet. at 7.  Petitioner first raised this claim in his state habeas petition, arguing that the trial court violated his right to a speedy trial because he was not brought to trial within 60 days from when he was first held to answer the charges.  Resp. Exh. I at 3.  The Court of Appeal declined to review the claim because Petitioner failed to raise the issue on direct appeal.  Resp. Exh. L at 1-2.

Under federal law, to determine if an accused's Sixth Amendment right to a speedy trial has been violated, the court must look to (1) the length of the delay; (2) the reason for the delay; (3) assertion of the right by the defendant; and (4) prejudice to the defendant.  *See United States v. Williams*, 782 F.2d 1462, 1465 (9th Cir.1985).  However, the threshold inquiry is whether the alleged delay was presumptively prejudicial, otherwise no need exists to inquire into the other factors.  *See Barker v. Wingo*, 407 U.S. 514, 530 (1972).

Petitioner waived formal arraignment on November 27, 2006.  Resp. Exh. A4 at 893.  Jury trial commenced on January 29, 2007, which was two days after the expiration of the 60-day limit.  A delay of this length is not presumptively prejudicial for Sixth Amendment purposes.  *See United States v. Doggett*, 505 U.S. 647, 652 n. 1 (1992) (finding that a delay approaching one year is presumptively prejudicial to trigger speedy trial analysis under the Sixth Amendment).  Thus, in addition to being procedurally barred under state law, Petitioner's Sixth Amendment speedy trial claim does not entitle him to federal habeas relief.

As referenced, California law allows for 60 days from the date of arraignment for a defendant to be brought to trial, *see* Cal. Penal Code § 1382(c)(2), and jury trial commenced two days after the expiration of the 60-day limit.  To the extent that Petitioner is challenging the trial court's denial of his motion to dismiss under Cal. Penal Code § 1382(a)(2), the claim is not cognizable on federal habeas review.  *See Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

///

///

15

### III.    Prosecutorial Misconduct

Petitioner claims that the prosecutor committed misconduct in the following different ways: (1) by failing to disclose exculpatory evidence pursuant to its obligation under *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963); (2) by violating his right to confront and cross-examine witnesses against him because the victims of counts 1, 3, 6 and 9 did not testify or otherwise appear at the trial; (3) by redacting his co-defendant's statement to remove a portion that was favorable to him; (4) by referring to his drug use during closing argument; (5) by introducing evidence of two prior misdemeanors that resulted in convictions; (6) by suggesting that he introduced his son, Ray III, to crack cocaine; (7) by improperly vouching for a witness; (8) by referencing facts that were not in evidence during her closing argument; (9) and by knowingly using perjured testimony to obtain the conviction.  Hab. Pet. at 10-15.

It appears that Petitioner's *Brady* claim is the only one that has been properly exhausted. However, respondent has waived the issue by addressing the merits of Petitioner's remaining claims. *See United States v. Doe*, 53 F.3d 1081, 1082-83 (9th Cir. 1995).  The court will therefore exercise its discretion and reach the merits of Petitioner's claims.  *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998).

#### A. *Brady* Claim

Petitioner claims that the prosecutor failed to disclose evidence of a similar convenience store robbery that took place in East Oakland after Petitioner was arrested and in custody on the instant charges.  Hab. Pet. at 10.  Petitioner refers the court to a newspaper article describing a three-man robbery of the Ed-Green convenience store in East Oakland that happened on February 24, 2007 and was captured by surveillance footage.  Hab. Pet. Exh. I at 61.  Petitioner contends that the article's description of the robbery, along with an accompanying photo from the surveillance camera footage, depicts a modus operandi that was sufficiently similar to the instant charges such that it triggered the prosecutor's obligation to disclose material, exculpatory evidence under *Brady*, and that the willful suppression of this information until after his conviction violated this obligation.  *Id.* at 67.

///

///

### i. Legal Standard

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. The Supreme Court has since made clear that the duty to disclose such evidence applies even when there has been no request by the accused, *see United States v. Agurs*, 427 U.S. 97, 107 (1976), and that the duty encompasses impeachment evidence as well as exculpatory evidence, *see United States v. Bagley*, 473 U.S. 667, 676 (1985).

There are three components to a *Brady* violation. *See Benn v. Lambert*, 283 F.3d 1040, 1052 (9th Cir. 2002). First, the suppressed evidence must be favorable to the accused. *See Bagley*, 473 U.S. at 676 (1985) *citing Brady*, 373 U.S. at 87. Second, the evidence must have been suppressed by the government, either willfully or inadvertently. *See Agurs*, 427 U.S. at 110. Third, the suppressed evidence must be material to the guilt or innocence of the defendant. *See Bagley*, 473 U.S. at 676-78. Evidence is deemed prejudicial, or material, only if it undermines confidence in the outcome of the trial. *Id.* at 676. *Brady* has no good faith or inadvertence defense; whether nondisclosure was negligent or by design, it is the responsibility of the prosecutor. *See Gantt v. Roe*, 389 F.3d 908, 912 (9th Cir. 2004). Moreover, the rule encompasses evidence "'known only to police investigators and not to the prosecutor.'" *See Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) *quoting Kyles v. Whitley*, 514 U.S. 419, 438 (1995). In order to comply with *Brady*, therefore, "'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police.'" *Id. quoting Kyles*, 514 U.S. at 437.

### ii. Court of Appeal Opinion

Petitioner first raised this claim in his state habeas petition. Resp. Exh. N. The California Court of Appeal, citing *People v. Romero*, 8 Cal. 4th 728, 737 (1994), found that Petitioner failed to establish a prima facie case for relief on this ground. Resp. Exh. L at 2.

### iii. Discussion

Petitioner's claim lacks merit. The Ed-Green robbery took place on February 24, 2007, and this case went to the jury on March 13, 2007. Resp. Exh. A5 at 1078. Assuming for the sake of

argument that the prosecution was aware of the existence of surveillance camera footage and any accompanying photos from the Ed-Green robbery before the end of Petitioner's trial, such evidence would be favorable to Petitioner only if it could make the difference between conviction and acquittal. *See Bagley*, 473 U.S. at 676. This is not such a case. The evidence is not material because, even if it had been disclosed to the defense and used in as effective a manner as possible, there is not a reasonable probability that the result of the proceeding would have been different. *Id.* at 682. A review of the trial record indicates that the differences between the robberies defeated any inference that the Ed-Green robbers were the same robbers charged in the instant offense. Moreover, the vague similarities noted by Petitioner could match any number of robberies taking place in any location, and paled in comparison to the specific similarities between the charged counts themselves. Likewise, in denying Petitioner's post-trial motion to disclose exculpatory evidence of other robberies that took place in Oakland, the trial court noted that such evidence would have been "of limited value in establishing a defense, in view of the overwhelming evidence of the similarities of the figures stated on the surveillance tapes in this case." Resp. Exh. B9 at 1472-73.

The court agrees with the trial court's assessment of Petitioner's claim. Petitioner was apprehended following a high speed chase after being observed by a police officer running from a 7-Eleven, and was linked to the instant robberies by the statements of two co-defendants. Resp. Exh. H at 19-22. There is absolutely no evidence to suggest that the Ed-Green robbers were responsible for the crimes with which Petitioner was charged. In view of the overwhelming evidence of Petitioner's guilt, the evidence that he claims was suppressed in violation of *Brady* (surveillance footage and photos from the Ed-Green robbery) is not material because its disclosure would not have presented a probability sufficient to undermine confidence in the outcome of the trial. *See Bagley*, 473 U.S. at 676; *Benn,* 283 F.3d at 1053. Accordingly, the California Court of Appeal's rejection of Petitioner's *Brady* claims was not contrary to or an unreasonable application of federal law. *See* 28 U.S.C. § 2254(d).

**B. Confrontation Clause**

Petitioner claims that the prosecution violated his right to confront and cross-examine witnesses against him because the victims of counts 1, 3, 6 and 9 did not testify or appear at the trial.

Hab. Pet. at 10.  This claim lacks merit.  There is no clearly established Supreme Court authority stating that a defendant's right of confrontation requires the victims of an offense to participate in a criminal prosecution by appearing in court or otherwise attending the trial.

### C.  Redaction of Co-Defendant's Statement

Petitioner claims that the court and/or the prosecution committed misconduct by redacting a portion of his co-defendant's statement that was favorable to him before it was read into the record. Hab. Pet. at 11.  United States Supreme Court authority provides that, before a co-defendant's statement can be introduced into evidence against a non-testifying co-defendant, the statement must be redacted to remove any reference to the nontestifying co-defendant. *See Gray v. Maryland*, 523 U.S. 185, 192 (1998).  In accordance with this requirement, the trial court redacted a portion of Ray III's statement referencing a pair of camouflage pants seized from the family residence, which he claimed belonged to Petitioner's daughter (his sister), and not to Petitioner. *Id.*  Resp. Exh. B8 at 1257.  Petitioner claims that this evidence was exculpatory because it contradicted the prosecution's argument that the pants belonged to him.  Hab. Pet. at 11.  However, the trial court specifically refused to allow Petitioner to choose to redact only inculpatory references, but not to redact exculpatory references.  Resp. Exh. B8 at 1256-57.  The court fails to see how the trial court's adherence to the requirements set forth by the Supreme Court amounts to misconduct on the part of either the court or the prosecution.

### D.  Reference to Petitioner's Drug Use During Closing Argument

Petitioner claims that the prosecutor committed misconduct by telling the jury that the "motive" for his crimes was "drug use," and that such statements amount to improper argument in violation of his constitutional rights. Hab. Pet. at 12.

#### i.  Factual Background

In his closing argument, the prosecutor suggested that drug use was a partial motive for the robberies:

> The law also says, having a motive is a factor showing that the defendant is guilty, what was he doing with all this money.  When he got big money from the Long's Drugs, he bought a few cars, but the little money that he was getting, $60 here and there from the 7-Eleven[s], he was buying drugs.  He was smoking crack in the RV with his wife Tina, the Third, [i.e Ray III] who he turned on to crack and his four year old would have to climb into the top camper so she

wouldn't be inhaling his crack smoke.

Resp. Exh. B9 at 1401.

### ii. Legal Standard

Clearly established Supreme Court authority provides that a prosecutor's improper comments violate the Constitution only if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (citations omitted).

### iii. Discussion

Even assuming that the prosecutor's statements during closing argument were improper, in light of the totality of the evidence presented at trial, the court cannot say the prosecutor's comments tainted the verdict and deprived Petitioner of a fair trial. Moreover, any potential prejudice that may have resulted from the prosecutor's improper comments was cured by the court's instruction to the jury that the parties' statements in their closing argument are not evidence. Resp. Exh. D at 15; *see Fields v. Brown*, 503 F.3d 755, 787 (9th Cir. 2007) (jurors are presumed to follow the trial court's instructions). Viewing the record in its entirety, the prosecutor's comments did not deprive Petitioner of a fair trial. *See Darden*, 477 U.S. at 181.

### E. Prior Convictions

Petitioner claims that the prosecutor committed misconduct by introducing "details and circumstances" of two misdemeanor crimes that resulted in prior convictions. Hab. Pet. at 13. Petitioner's claim fails for lack of specificity. Petitioner fails to point out how these references affected his case, and fails to identify where in the record evidence to support his claim can be found. *See James v. Borg*, 24 F.3d 20, 26 (9th Cir. 1994) ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief).

### F. Suggestion That Petitioner Introduced His Son to Crack Cocaine

Petitioner claims that the prosecutor improperly accused him of turning his "18 year old son on to smoking crack cocaine." Hab. Pet. at 13.

The prosecutor, on cross examination, asked Petitioner whether it was true that when his son turned 18, he turned him on to smoking crack. Resp. Exh. B8 at 1277. Petitioner answered that he

20

did not. *Id.* The record reflects that a question was asked by the prosecutor and answered in the negative by Petitioner. There was no accusation and the jury was not asked to draw an improper inference. The court fails to see how this amounts to misconduct on the part of the prosecutor.

### G. Improper Vouching

Petitioner claims that the prosecutor's statement that a government witness was telling the truth amounts to improper vouching. Hab. Pet. at 14.

Improper vouching can occur in a variety of circumstances, for instance: when the prosecutor places the prestige of the government behind the witness by providing personal assurances of the witness's veracity; where the prosecutor suggests that the testimony of government witnesses is supported by information outside that presented to the jury; or where the prosecutor expresses an opinion of the defendant's guilt or denigrates the defense as a sham, *See United States v. Wright*, 625 F.3d 583, 610 (9th Cir. 2010). "[V]ouching typically involves the prosecution bolstering the testimony of its own witness." *Id.* (citation omitted).

Petitioner refers the court to the prosecutor's comments during closing argument regarding the testimony of Larry Carrington, stating that Carrington testified truthfully and that his testimony was believable. Resp. Exh. 9 at 1401-02. The statements identified by Petitioner do not amount to vouching as the prosecutor did not make any personal assurances regarding the credibility of Carrington's testimony, but instead argued that the jury could infer that Carrington was telling the truth based on the totality of the evidence presented. Viewing the record in its entirety, the court finds no support for Petitioner's argument that the government's statements during closing argument constituted improper vouching.

### H. Referencing Facts That Were Not in Evidence

Petitioner contends that, during closing argument, the prosecutor made several references to a pair of camouflage pants (seized from the family's RV during the execution of a search warrant) that did not belong to him, and claims that the comments were improper because they were based on facts not in evidence. Hab. Pet. at 14.

Petitioner's claim lacks merit. During his closing argument the prosecutor argued to the jury that the camouflage pants seized from the RV did not fit Carrington or Melissa (Petitioner's

United States District Court

For the Northern District of California

daughter), but did fit Petitioner.  Resp. Exh. B9 at 1426-27.  The pants were admitted into evidence, and the jury was familiar with the appearance of both Carrington (who testified) and Melissa (shown in videotapes and photos).  Resp. Exh B7 at 977-1076, B8 at 1311-12.  The prosecutor's comments were not improper as they suggested to the jury that they should draw a reasonable inference based on evidence that was properly before them.

## I. Perjured Testimony

Finally, Petitioner contends that the prosecutor knowingly used perjured testimony to secure the conviction, and deliberately suppressed evidence that would have impeached and refuted the testimony against him.  Hab. Pet. at 15.

Both of these claims fail for lack of specificity.  *See James,* 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief).

## IV.   Illegal Sentence Enhancement

Petitioner contends that the evidence was insufficient to support the enhancements imposed for the personal use of a firearm and personal infliction of great bodily injury.  Hab. Pet at 16-20.

### A. Legal Standard

In *Jackson v. Virginia*, 443 U.S. 307, 316 (1979), the Supreme Court established the due process standard by which federal courts review a habeas corpus petition challenging the sufficiency of evidence for a state conviction.  Due process requires that "no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof–defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  *Id.* at 316. A state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt states a federal constitutional claim that, if proven, entitles him to federal habeas relief.  *Id.* at 321, 324.

A federal court reviewing a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt.  *See Payne v. Borg*, 982 F.2d 335, 338 (9th Cir. 1993).  The federal court "determines only whether, 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt.'" *Id. quoting Jackson*, 443 U.S. at 319.  A court must apply the *Jackson* standard "with explicit reference to the substantive elements of the criminal offense as defined by state law."  *See Chein v. Shumsky*, 373 F.3d 978, 983 (9th Cir. 2004) (citation omitted).

Under the *Jackson* standard, a conviction may be supported by logical inferences from circumstantial evidence, but the inferences cannot be merely speculative.  *See Sarausad v. Porter*, 479 F.3d 671, 677 (9th Cir. 2007), *rev'd on other grounds sub nom. Waddington v. Sarausad*, 555 U.S. 179, 182 (2009); *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995).  Where behavior is consistent with both guilt and innocence, the burden is on the state to produce evidence that would allow a rational trier of fact to conclude beyond a reasonable doubt that the behavior was consistent with guilt; however, the "prosecution need not affirmatively rule out every hypothesis except that of guilt."  *See Sarausad*, 479 F.3d at 678 (citation, quotations omitted).

After passage of the Antiterrorism and Effective Death Penalty Act ("AEDPA"), a federal habeas court applies the standards of *Jackson* with an additional layer of deference.  *See Juan H. v. Allen*, 408 F.3d 1262, 1274 (9th Cir. 2005).  The Ninth Circuit has held that section 2254(d)(1) of AEDPA applies to federal review of a state court's sufficiency of the evidence determination under *Jackson*.  *Id.* at 1274-75.  If the state court affirms a conviction under *Jackson*, the federal court must decide whether the state court's application of *Jackson* was objectively unreasonable.  *See Sarausad*, 479 F.3d at 677-78.  The Ninth Circuit has adopted guidelines for determining whether a state court applied *Jackson* in an objectively unreasonable manner under section 2254(d)(1), which states as follows:

(1) The focus of the inquiry is on the state court decision;

(2) Even with the deference due by statute to the state court's determinations, the federal habeas court must look to the "totality of the evidence" in evaluating the state court's decision;

(3) The failure of the state court to consider at all a key argument of the defendant may indicate that its conclusion is objectively unreasonable; however, the paucity of reasoning employed by the state court does not itself establish that its result is objectively unreasonable;

(4) The failure of a state court to give appropriate weight to all of the evidence may mean that its conclusion is objectively unreasonable; and

(5) The absence of cases of conviction precisely parallel on their facts does not, by itself, establish objective unreasonableness.

*Sarausad*, 479 F. 3d at 678 (citation omitted).

In contrast, section 2254(d)(2) does not apply to *Jackson* cases because the federal court does not decide whether the state court unreasonably determined disputed facts. *Sarausad*, 479 F.3d at 678. Rather, the court must decide whether the state court unreasonably applied the *Jackson* test. *Id.* at 683. Accordingly, a federal court evaluates a challenge to a state conviction on insufficient evidence grounds under section 2254(d)(1) rather than (d)(2). *Id.* at 678.

## B. California Law

### i. Personal Use of a Firearm

California Penal Code section 12022.53(b) provides that any person who personally uses a firearm when committing an enumerated felony, shall be punished by an additional and consecutive term of imprisonment in the state prison for 10 years. *See* Cal. Penal Code § 12022.53(b). The firearm need not be operable or loaded for this enhancement to apply. *Id.* Circumstantial evidence alone is sufficient to support a finding that an object used by a robber was a firearm, so where a defendant commits a robbery by displaying an object that looks like a gun, the defendant's conduct and words may provide sufficient circumstantial evidence to support the enhancement. *See People v. Law*, 195 Cal. App. 4th 976, 983 (2011).

### ii. Great Bodily Injury

California Penal Code section 12022.7 provides that "[a]ny person who personally inflicts great bodily injury on any person other than an accomplice in the commission of a felony or attempted felony shall be punished by an additional and consecutive term of imprisonment in the state prison for three years." *See* Cal. Penal Code § 12022.7. Great bodily injury "means a significant or substantial physical injury," *see* Cal. Penal Code § 12022.7(f), and it is well settled that this is a factual, not a legal determination. *See People v. Escobar*, 3 Cal. 4th 740, 749 (Cal. 1992).

## C. Discussion

### i. Factual Background

With respect to the firearm enhancements imposed on counts 16 and 17, the victim of the robbery described two men wearing hoods and masks that entered his store. Resp. Exh. H at 10. The taller of the two men was holding what appeared to be a shotgun, and the shorter one held a grey or

silver handgun. *Id.* The taller man pointed the shotgun at the victim and demanded that he open the register and hand over his wallet. *Id.* Petitioner was later identified as the man with the shotgun. *Id.*

With respect to the firearm and great bodily injury enhancements imposed on count 22, the victim stated that two men entered the store, one holding what appeared to be a short-barrel shotgun, and ordered him to open the register. *Id.* at 12. The gunman demanded the victim's wallet, and when the victim resisted, struck him in the forehead with the weapon, drawing blood and gashing his skin to the bone, and knocking him to the floor. *Id.* The robbers then fled with the register cash drawer and the wallet. *Id.*

With respect to the firearm and great bodily injury enhancements imposed on count 23, the victim described three men that entered his store, one with a shotgun and another with a handgun. *Id.* at 13. The robber with the shotgun was described as white, in his 30's and about 5 feet, 7 inches tall. *Id.* The robber with the shotgun ordered the victim to open the register, but he was unable to do so. *Id.* After he finally got the register open, the robber with the shotgun struck the victim in the head with the shotgun, opening a wound that required eight staples to close. *Id.* at 13. Co-defendant Larry Carrington testified that he committed the robbery with Petitioner and his son, and identified Petitioner from the surveillance video as the person with the shotgun. *Id.*

### ii. Analysis

Petitioner claims that the evidence was insufficient to support the enhancements because a shotgun was never recovered, and the victims' varying descriptions of the robbers did not definitively identify him as the assailant who possessed the shotgun or inflicted great bodily injury. Hab. Pet. at 16-17. These claims lack merit. A firearm enhancement under Cal. Penal Code § 12022.5 is appropriate where the defendant menacingly displays a firearm during the course of a robbery. *See Ballard v. Estelle*, 937 F.2d 453, 457 (9th Cir. 1991). The fact that a shotgun was never recovered is immaterial, as circumstantial evidence alone is sufficient to support the enhancement under California law. *See Law*, 195 Cal. App. 4th at 983. Moreover, there is no doubt that, under the facts presented at trial, the jury reasonably determined that the victims suffered great bodily injury.

Petitioner correctly points out that the victims' varying descriptions of the robbers do not definitively identify him as the robber with the shotgun, or the robber who inflicted great bodily

United States District Court
For the Northern District of California

injury.  However, in counts 16 and 17, Petitioner was identified by the victim as the man with the shotgun, and in count 23, Carrington identified Petitioner from surveillance footage as the robber with the shotgun.  Resp. Exh. H at 10, 13.  Both witnesses were subject to cross examination, and counsel was able to attack the victim's identification, and expose Carrington's motive to lie.  Resp. Exh B3 at 469-475, B7 at 1031-32.  The jury was presented with arguments from both sides, and assessed the witnesses credibility accordingly.  Based on the evidence presented at trial, and in view of the double layer of deference required by *Jackson* and AEDPA*, the court cannot grant relief.

Viewing the evidence in the light most favorable to the prosecution, the record supports the conclusion that any rational trier of fact could have found the essential elements to support the enhancements beyond a reasonable doubt.  *See United States v. Herrera-Gonzalez*, 263 F.3d 1092, 1095 (9th Cir. 2001).  The state court's determination that there was sufficient evidence to support the jury's finding of true on the firearm and great bodily injury enhancements was not contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1); *Jackson v. Virginia*, 443 U.S. 307, 316 (1979).

**V.     Failure to Adequately Redact Codefendant's Statements**

Petitioner claims that admission of a co-defendant's (Ray III) redacted statement violated his Sixth Amendment right of confrontation.  Hab. Pet. at 21.

**A. Court of Appeal Opinion**

The California Court of Appeal addressed this claim as follows:

Ray III did not testify at trial.  A transcript of Ray III's statements to police, in which he admitted his participation in the majority of the charged offenses, was read to the jury with all references to Ray Jr. redacted.  The trial court required that the redaction be done in such a fashion as to "eliminate all references, not only to the nondeclarant's name, but also to the nondeclarant's very existence," relying on *Richardson v. Marsh* (1987) 481 U.S. 200 *(Richardson)* and *People v. Fletcher* (1996) 13 Cal. 4th 451 *(Fletcher)*.  The jury was also instructed that it could consider Ray III's statements only as to him, and not as to Ray Jr.

Ray Jr. asserts that the redaction "proved futile" and remained "powerfully incriminating."  He contends that he was deprived of his Sixth Amendment right of confrontation by introduction of this evidence. (*Crawford v. Washington* (2004) 541 U.S. 36 *(Crawford)*; *Bruton, supra*, 391 U.S. 123.) We disagree.

Appellant's argument is that, despite removal of any reference in Ray III's statement to any other person, the statements "linked with other evidence produced at trial," including the surveillance videos revealing the participation of other culprits, made the redactions ineffective.  The very argument that appellant

26

makes here, however, has been rejected by the United States Supreme Court in *Richardson*, *supra*, 481 U.S. 200, and by our own Supreme Court in *Fletcher*, *supra*, 13 Cal. 4th 451-cases upon which appellant relies.

A defendant is deprived of his Sixth Amendment right of confrontation when the facially incriminating confession of a nontestifying codefendant is introduced at their joint trial, even if the jury is instructed to consider the confession only against the codefendant. (*Bruton*, *supra*, 391 U.S. 123.) In *Richardson*, the Supreme Court refused to extend what it termed the "narrow exception" created in *Bruton* to the "almost invariable assumption of law that jurors follow their instructions" when told to consider evidence only for limited purposes. (*Richardson*, *supra*, 481 U.S. at 206-207.) In the case before the Court, defendant Marsh and two other individuals were jointly charged with assault and multiple murders. A confession given by one codefendant was redacted to omit all reference to Marsh, and further to omit all indication that anyone other than the codefendant and the then fugitive third defendant participated in the crime. (Id. at 203.) The confession as redacted was not incriminating on its face, but became so only when linked with evidence introduced later at trial, in this case the defendant's own testimony. The Supreme Court granted certiorari after the Court of Appeal granted Marsh's petition for habeas corpus, holding that a trial court must assess the confession's "inculpatory value" under *Bruton* by examining not only the face of the confession, but also all of the evidence introduced at trial, and that Marsh's own trial testimony placing her in a vehicle with the codefendant near the time of the offense made the codefendant's statement "powerfully incriminating" to Marsh, thereby violating the Confrontation Clause. (Id. at 205-206.)

The Supreme Court rejected the "evidentiary linkage" or "contextual implication" approach to *Bruton* questions adopted by the Court of Appeal, noting the problems which would arise if such a rule were adopted. Among the difficulties created would be an inability to comply with the "*Bruton* exception" by means of redaction, and the impossibility of predicting the admissibility of a confession in advance of trial, presumably requiring a trial judge to assess at the end of each trial whether, in light of all of the evidence, a nontestifying codefendant's confession has been so "powerfully incriminating" that a new, separate trial is required for the defendant. (*Richardson*, *supra*, 481 U.S. at 208-209.) Rejecting this approach, and the position Ray Jr. urges here, the Court held, "While we continue to apply *Bruton* where we have found that its rationale validly applies [citation], we decline to extend it further. We hold that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when, as here, the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." (*Id.* at 211; *see also Gray v. Maryland* (1998) 523 U.S. 185, 195 ["*Richardson* placed outside the scope of *Bruton's* rule those statements that incriminate inferentially"].)

Our own Supreme Court in *Fletcher* declined to draw a bright line rule on the efficacy of redaction which retains references to a coparticipant in the crime while removing the coparticipant's name, requiring a determination on a case by case basis whether the nondeclarant defendant's constitutional right of confrontation is violated. (*Fletcher*, *supra*, 13 Cal. 4th at 456-457.) "[T]he efficacy of this form of editing must be determined on a case-by-case basis in light of the other evidence that has been or is likely to be presented at the trial. The editing will be deemed insufficient to avoid a confrontation violation if, despite the editing, reasonable jurors could not avoid drawing the inference that the defendant was the coparticipant designated in the confession by symbol or neutral pronoun." (*Id.*

27

at 456.)  The Court, however, distinguished such a situation from the rule annunciated in *Richardson* that admission of a codefendant's confession at a joint trial only violates the codefendant's rights under the Confrontation Clause where the redacted confession is not only "powerfully incriminating" but also "facially incriminating" of the nondeclarant defendant. (*Id.* at 455; *see also People v. Garcia* (2008) 168 Cal. App. 4th 261, 281-282.)  A rule of "contextual implication" raising constitutional confrontation issues arises only when internal reference in the statement, taken with other evidence, would result in a situation "where any reasonable juror must inevitably perceive that the defendant on trial is the person designated by a pronoun or neutral term in the codefendant's confession." (*Fletcher*, *supra*, 13 Cal. 4th at 466, 468.)  The redaction of Ray III's statement here created no such issue.

Ray Jr. also contends that admission of Ray III's statement was erroneous under *Crawford*, *supra*, 541 U.S. 36.  In *Crawford* the Supreme Court held that admission of testimonial hearsay statements against a defendant violates the Sixth Amendment confrontation clause when the declarant is not subject to cross-examination. (*Id.* at 53-54.)  Testimonial hearsay includes statements taken in police interrogations.  (*Id.* at 52.)  Nonetheless, admission of such statements violates a defendant's confrontation rights only to the extent they are admitted "against" him.  The redacted statement contained no evidence against defendant and thus cannot implicate the confrontation clause.  "The same redaction that 'prevents *Bruton* error also serves to prevent *Crawford* error.' [Citation.]" (*People v. Stevens* (2007) 41 Cal. 4th 182, 199.)

Resp. Exh. B6 at 1164.

**B. Discussion**

Petitioner alleges that the state court's decision was contrary to clearly established federal law, claiming that, despite the redaction, he was "directly implicated" by Ray III's statement in two specific instances.  Hab. Pet. at 23.  First, a portion of the statement that was read to the jury left in a reference to Ray III's "dad" as the person driving the RV that Ray III and Carrington used to flee the scene of one of the robberies and; second, the discussion regarding a defense motion for a mistrial contained a lengthy reference to Petitioner.  Resp. Exh. B8 at 1194, 1258.  The second instance referred to by Petitioner was not part of Ray III's statement and took place outside the presence of the jury, therefore it does not implicate Petitioner's right to confrontation.  The first instance arguably violates the Sixth Amendment because, even though it doesn't demonstrate that Petitioner participated in the robbery itself, the jury could infer guilt based on the fact that he was the driver of the getaway vehicle.  Resp. Exh. B8 at 1194, *see Gray v. Maryland*, 523 U.S. 185, 195-97 (1998).

However, in light of the relatively minor nature of the reference, any potential harm that it caused was cured by the court's instruction that statements made by Ray III could only be considered against him and not against Petitioner.  Resp. Exh. A5 at 1151; *see Fields v. Brown*, 503 F.3d 755,

28

787 (9th Cir. 2007) (jurors are presumed to follow the trial court's instructions).  On this record,  the court finds that any error was harmless because it did not have "a substantial and injurious effect or influence in determining the jury's verdict." *See Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993).

**VI.    Ineffective Assistance of Counsel**

Petitioner alleges that both trial and appellate counsel were ineffective in several different ways. Hab. Pet. at 24-30.

**A.  Legal Standard**

In order to succeed on an ineffective assistance of counsel claim, the Petitioner must satisfy the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which requires him to show deficient performance and prejudice.  Deficient performance requires a showing that trial counsel's representation fell below an objective standard of reasonableness as measured by prevailing professional norms.  *See Wiggins v. Smith*, 539 U.S. 510, 521 (2003).  To establish prejudice, Petitioner must show a reasonable probability that "but for counsel's unprofessional errors, the result of the proceeding would have been different."  *See Strickland*, 466 U.S. at 694.  If a Petitioner cannot establish that defense counsel's performance was deficient, it is unnecessary for a federal court considering a habeas ineffective assistance claim to address the prejudice prong of the *Strickland* test.  *See Siripongs v. Calderon*, 133 F.3d 732, 737 (9th Cir. 1998).

The Due Process Clause of the Fourteenth Amendment guarantees a criminal defendant the effective assistance of counsel on his first appeal as of right.  *See Evitts v. Lucey*, 469 U.S. 387, 391- 405 (1985).  Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in *Strickland,* 466 U.S. 668 (1984).  *See Miller v. Keeney*, 882 F.2d 1428, 1433 (9th Cir. 1989).  Appellate counsel does not have a constitutional duty to raise every nonfrivolous issue requested by defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751-54 (1983).  The weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy.  *Id.* at 751-52**.**

Because the California Supreme Court summarily denied the petition with no explanation, the court must conduct an independent review of the record to determine whether its decision denying Petitioner's claims of ineffective assistance of counsel was objectively unreasonable.  *See Delgado,*

223 F.3d at 982.

**B.  Ineffective Assistance of Trial Counsel**

**i.  Confrontation Clause**

Petitioner claims that, in counts 1, 3, 6, 9, and 19, trial counsel should have objected, on confrontation clause grounds, to the prosecution's failure to call the victims of those crimes as witnesses.  Hab. Pet. at 25.

As discussed *supra* in section III B., there is no clearly established Supreme Court authority stating that a defendant's right of confrontation requires the victims of an offense to participate in a criminal prosecution by appearing in court or otherwise attending the trial.  In some situations, such as murder trials, it would not even be possible.  Counsel was not ineffective for failing to raise a meritless argument.  *See Moormann v. Ryan*, 628 F.3d 1102, 1110 (9th Cir. 2010) *quoting Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir.1985) ("Failure to raise a meritless argument does not constitute ineffective assistance.").  Accordingly, the state court's decision denying relief on this claim was not objectively unreasonable.

**ii.  Failure to Confer with Petitioner**

Petitioner claims that trial counsel failed to confer with him, keep him informed, and "elicit matters of defense."  Hab. Pet. at 26.  Specifically, Petitioner contends that counsel only met with him twice, each time for less than 15 minutes.  *Id.*  In the first meeting, they discussed a plea offer of 28 years, which Petitioner declined, and in the second meeting counsel asked Petitioner not to testify, a request which he ignored.  *Id.*  Even assuming that counsel's performance was deficient for failing adequately to confer with Petitioner and to keep him reasonably informed of developments in his case, Petitioner's claim fails for lack of prejudice because he cannot demonstrate a reasonable probability that the result of the proceeding would have been different had counsel met with him more often.  *See Strickland*, 466 U.S. at 694.  The state court's decision denying relief on this claim was not objectively unreasonable.

**iii.  Failure to Investigate All Defenses of Facts and Laws**

Petitioner states that several prosecution witnesses provided favorable, exculpatory testimony describing a robber as either "a black guy," "black," or "hispanic," all descriptions that did not fit

30

him.  Hab. Pet. at 26., Resp. Exh. B5 at 653, B6 at 757, 760, 762.  Petitioner claims that trial counsel "never objected, or asked for a limiting instruction to bar the prosecution from admitting evidence that was NOT cross-admissible on the issue of identity," and that counsel failed to object on grounds of relevance-thereby affecting the outcome of the trial.  Hab. Pet. at 26.  The allegation is vague and conclusory, as Petitioner fails to identify how he was prejudiced by counsel's failure to take these steps.  *See James*, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief").  The state court's decision denying relief on this claim was not objectively unreasonable.

### iv. Failure to Subject the Prosecution's Case to Adversarial Tests

At the preliminary hearing, a note was found in Petitioner's sock which he claims was a signed admission of guilt authored by a co-defendant.  Hab. Pet. at 27.  Petitioner states that trial counsel was aware that someone other than him claimed authorship of the note, and argues that counsel was ineffective for failing to bring the signed confession to the jury's attention as evidence of his innocence.  *Id.*

The facts underlying this claim are as follows:  On cross-examination the prosecutor asked Petitioner whether he wrote the note that was taken from his sock.  Resp. Exh. 8 at 1312-13.  Petitioner testified that he did not write the note, and that someone handed it to him on the prison bus on the way to the hearing.  *Id.* at 1313.  He stuffed it in his sock and did not get the chance to read it before it was taken from him.  *Id.*  The prosecutor read the note to Petitioner, and he confirmed its accuracy.  *Id.* at 1313-15.  The note appeared to be directed toward his son, Ray III, asking him to "stay strong"and to tell the investigators "it wasn't me."  *Id.* at 1314.  The note also said, "If you do take this, I will owe you forever," and "all you got to do is not to tell them cops anything."  *Id.* at 1314-15.  When asked by the prosecutor, Petitioner specifically denied that he wrote the letter to his son.  *Id.* at 1315.

Petitioner alleges that a co-defendant (presumably his son) signed "an admission of guilt" that he authored the note, and that trial counsel was aware of this signed confession yet failed to introduce it into evidence.  Hab. Pet. at 27.  Petitioner has failed to produce any evidence, either here or in his state habeas petition, that would support his bare allegation that someone other than he claimed to

have written the note. Petitioner's unverifiable and unsupported claim cannot support habeas relief. *See James*, 24 F.3d at 26 ("Conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief."). The state court's decision denying relief on this claim was not objectively unreasonable.

### v. Failure to Call Christina Miller As a Witness

Petitioner claims that trial counsel was ineffective for calling no witnesses on his behalf. Hab. Pet. at 27. The court previously determined that this claim was exhausted as to only one witness, Christina Miller. Order, April 15, 2011.

In his state habeas petition, Petitioner alleges that Miller, one of the victims in count 3, told police that all three men were African-American. Hab. Pet., Exh. H at 29. Petitioner claims that her testimony would have helped the defense because her description of the robbers was inaccurate, therefore counsel should have compelled her attendance at trial. *Id.*

In support of this contention, Petitioner directs the court's attention to the appendix, however no appendix was attached. *Id.* On this basis alone, the court Petitioner's claim lacks merit. However, assuming for the sake of argument that Petitioner's account of Miller's statement is accurate*,* counsel's strategic decision not to call her as a witness was nevertheless reasonable, as there is no indication from this statement alone that her testimony would have been favorable to the defense, and could in fact have been harmful to his defense. Defense counsel is empowered to make such strategic decisions, so long as they are reasonable and informed. *See Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002). Miller's description of the robbers could have been inaccurate for any number of reasons, including the fact that she was being terrorized at gunpoint, because the robbers were wearing masks, or because her memory was faulty. Resp. Exh. H at 3. Alternatively, she could have been a particularly sympathetic victim. Petitioner fails to explain how exactly Miller's testimony would have helped his defense, aside from the observations that as to this one charge, the victim's description was shaky and uncertain. "A convicted defendant making a claim of ineffective assistance must identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Strickland*, 466 U.S. at 690. The state court's decision denying relief on this claim was not objectively unreasonable.

### vi.  Failure to Prepare for Sentencing

Petitioner argues that trial counsel provided ineffective assistance at sentencing by (1) failing to contest the restitution alleged in counts two and three; and (2) for failing to argue mitigating facts. Hab. Pet. at 27.

Petitioner's claim lacks merit.  There is no clearly established Supreme Court precedent by which to evaluate counsel's performance in noncapital sentencing cases.  *See Davis v. Grigas*, 443 F.3d 1155, 1158 (9th Cir. 2006); *Cooper-Smith v. Palmateer*, 397 F.3d 1236, 1244 (9th Cir. 2005).

In any case, Petitioner's argument that the restitution amount set by the court is greater than the reported loss fails, as it is apparently based on the store manager's statement provided to police. The probation officer's report indicates that the total amount of loss suffered by Long's Drugs was roughly $50,000, and the amount attributable to Petitioner from the robbery in counts two and three is more than $30,000.  Resp. Exh. A5 at 1227.  Petitioner offers no evidence to show that the probation officer's report is incorrect.  Based on this calculation, counsel had no basis for objecting, as the court's order that Petitioner pay restitution in the amount of $25,000 was entirely reasonable.

Additionally, Petitioner fails to identify the mitigating factors that counsel should have presented.  Counsel argued for a middle-term sentence, based on the fact that there were no aggravating factors, scant evidence of planning, and nothing to indicate that Petitioner forced the others to participate. Resp. Exh. B9 at 1478-79.  Petitioner presented his own mitigating arguments in his prepared statement to the court.  *Id.* at 1479.  Finally, the court, in arriving at the sentence, considered all the factors in mitigation, in particular the fact that Petitioner's criminal history was relatively minor, and that he may have been influenced by drugs and alcohol. *Id.* at 1480.  There is no indication that counsel failed to present any mitigating factors that were requested by Petitioner.

### vii.  Failure to Object to the Imposition of a Knife Use Enhancement

Petitioner contends that trial counsel was ineffective for failing to object to the imposition of an enhancement for the use of a deadly weapon (knife) in counts 26 and 27, because it was not pled in the information.  Hab. Pet. at 28.

The factual basis for this claim is incorrect as the information alleged a firearm enhancement in counts 26 and 27, not a knife use enhancement.  Resp. Exh. A4 at 930-932.  The firearm

**United States District Court**
For the Northern District of California

allegations were both found true by the jury.  Resp. Exh. A5 at 1114-15.

### viii.  Failure to Object to Improper Identification Evidence

Petitioner claims that trial counsel was ineffective for not objecting when the victim in counts 16 and 17 identified him in court after failing to do so in a pretrial lineup.  Hab. Pet. at 29.

Stephen McManus was a customer in the South Shore Liquor Store when it was robbed on June 23, 2006.  Resp. Exh. H at 10.  McManus was unable to identify Petitioner in separate pretrial police lineups, but identified him in court based on his complexion, the shape of his face, the area around his eyes, the color of his hair, and his height.  *Id.*

Petitioner argues that McManus, after failing to identify him in pretrial lineups, should not have been permitted to make an in-court identification.  Hab. Pet. at 29.  Petitioner's claim lacks merit.  Trial counsel made a reasonable strategic decision not to try and exclude McManus's testimony and instead to impeach his in-court identification with prior non-identifications.  Defense counsel is empowered to make such strategic decisions, so long as they are reasonable and informed. *See Jennings v. Woodford*, 290 F.3d 1006, 1014 (9th Cir. 2002).  Counsel's performance in this regard was not deficient.  Even assuming that counsel's performance was deficient for failing make this objection, Petitioner's claim fails for lack of prejudice because he cannot demonstrate a reasonable probability that the result of the proceeding would have been different had Petitioner not been allowed to make the in-court identification.  *See Strickland*, 466 U.S. at 694.

### C.  Ineffective Assistance of Appellate Counsel

#### i.  Illegal Lineup

Petitioner claims that appellate counsel was ineffective for failing to challenge "the illegal lineup held without counsel present."  Hab. Pet. at 30.  The essence of this claim is that Petitioner's Sixth Amendment right to counsel was violated when the Oakland police conducted a physical lineup before Petitioner was appointed counsel.  Hab. Pet. Exh. H at 11, Exh. I at 35.

Petitioner's claim lacks merit, as he was not positively identified from any pretrial lineup.  Therefore there was no in-court identification that was tainted by a prejudicial police lineup procedure.  *See United States v. Wade*, 388 U.S. 218, 227 (1967).  Even if an in-court identification was the product of a prejudicial lineup, trial counsel could reasonably have concluded that the in-

34

court identification was not harmful to the defense because it could be impeached by the witness's prior non-identification.  Because the claim raised by Petitioner lacks merit, appellate counsel's failure to raise the issue on appeal was neither deficient nor prejudicial under the *Strickland* standard. *See Rhoades v. Henry*, 638 F.3d 1027, 1036 (9th Cir. 2011).  Appellate counsel was not ineffective for failing to challenge the lineup.

### ii.  Failure to Challenge Counts With Enhancements

Petitioner claims that appellate counsel was ineffective for failing to challenge count 22,  in which he was sentenced to sixteen years for robbery, three years for a great bodily injury enhancement, and ten years for the personal use of a firearm enhancement.  Hab. Pet. Exh. H at 9. Specifically, Petitioner claims that he should have been exonerated by victim testimony describing men of a different race than him.  *Id.*

Petitioner's contention lacks merit.  On direct appeal, appellate counsel specifically challenged the sufficiency of the evidence to support Petitioner's conviction on count 22 based on the lack of credible identification evidence.  Resp. Exh. E at 34.  The California Court of Appeal acknowledged that there was no direct evidence of Petitioner's identity as one of the robbers, and that his guilt was established by circumstantial evidence.  Nevertheless, the court rejected this claim, finding that under the totality of the circumstances the evidence circumstantially established Petitioner's identity as the robber, notwithstanding the fact that witnesses were unsure of the race of the two men.  Resp. Exh. H at 42-50.  Accordingly, there is no basis for Petitioner's claim that appellate counsel was ineffective for failing to challenge this count.

### iii.  Confrontation Clause Violation

Petitioner claims that appellate counsel was ineffective for failing to raise a confrontation clause challenge to those counts where the victims failed to appear.  Hab. Pet. Exh. I at 35.  This claim was already presented as a claim of prosecutorial misconduct, *supra,* in section III B., and as a claim of ineffective assistance of trial counsel, *supra*, in section VI B.i.  The claim fails here for the same reasons.

## VII.   Altered Trial Testimony

Petitioner claims that the California Court of Appeal's opinion misstated the testimony that

was presented at trial.  Hab. Pet. at 31.  In describing the July 10, 2006 robbery of a 7-Eleven store in Oakland, the court wrote, "witnesses were unsure of the race of the two men."  Resp. Exh. H at 46. The record reflects that victim Francis Shelley described the first robber as being hispanic or black, based upon the amount of skin visible between his bandana and sunglasses.  Resp. Exh. B5 at 653. Victim Rita Thapa described the first robber as six foot tall and black, or "something like that." Resp. Exh. B6 at 757.  However, he had a handkerchief covering his face and was wearing gloves and a hat. *Id.* at 757-58.

Petitioner's argument lacks merit.  A review of the record indicates that neither witness was positive of their identification due to the fact that the robbers obscured their appearance with bandanas, gloves, hats, and hoodies.  Resp. Exh. B5 at 653, B6 at 758-59.  The language used in the state court opinion was entirely consistent with the witness's testimony that the robber was a dark-skinned individual of unknown race.

## VIII.   Modified Jury Instruction

Petitioner contends that the trial court erred by giving a modified version of CALCRIM 3515. Hab. Pet. at 32.

### A.  Factual Background

In rejecting this claim, the California Court of Appeal stated as follows:

Both appellants contend that the court erred in instructing the jury using a modified form of CALCRIM 3515, which advised the jurors that "Each of the counts charged in this case is a separate crime.  You must consider each count separately and return a separate verdict for each one. *In doing so, you must impartially compare and consider all the evidence that was received throughout the entire trial*." The court made clear it was giving this modification in lieu of requested a prosecution instruction on consideration of similar offenses to show identity under Evidence Code section 1101.

Both appellants insist that instructing the jury to consider "all the evidence" impermissibly allowed the jury to consider evidence on some counts that was not otherwise cross-admissible as evidence of guilt on other counts.  Ray Jr. asserts that this permitted the jury to improperly convict him on at least some charges using inadmissible modus operandi evidence and Ray III argues that the instruction was prejudicial as to him in that it "effectively relieved the prosecution of its burden to prove each element of an offense beyond a reasonable doubt."  Ray Jr. also complains that the court's instruction "left the jury with no guidance on proper consideration of evidence of similar acts to show pattern, intent, or identity (*People v. Ewoldt,* (1994) 7 Cal. 4th 380) and left the jury to speculate as to the sufficiency of additional counts to show identity."

There is no record that Ray III interposed any objection to the instruction.  The record reflects objection only by counsel for Ray Jr.  Having failed to raise this claim below, Ray III may not now assert it on appeal. (*See, e.g., People v. Stitely* (2005) 35 Cal. 4th 514, 546; Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2008) ¶ 8:229, p. 8-155.)  As to Ray Jr., we find that his claim of error is forfeited by his failure to seek any limiting instruction on use of the evidence, either at the time the evidence was received, or in the final instructions to the jury.

Ray Jr. focused, both in his briefs and in oral argument, on the question of whether the evidence adduced at trial was properly cross-admissible under Evidence Code section 1101, subdivision (b), and the criterion for admissibility and consideration of modus operandi evidence to circumstantially establish his guilt on those counts where there was no direct evidence connecting him to the offense.  In challenging cross-admissibility of evidence on the various counts, Ray Jr. relies primarily on authorities addressing standards for introduction of evidence of uncharged misconduct (*People v. Lewis* (2001) 25 Cal. 4th 610; *People v. Ewoldt, supra,* 7 Cal. 4th 380; *People v. Balcom* (1994) 7 Cal. 4th 414; *People v. Rivera* (1985) 41 Cal. 3d 388).  Ray Jr.'s arguments, however, ignore the significance of the context in which the evidence was presented to this jury-trial of properly joined multiple offenses. (§ 954; *see People v. Ochoa* (1998) 19 Cal. 4th 353, 409.)

Here there was no request by appellant to sever any of the multiple charged counts, and no evidence of any uncharged misconduct was presented to the jury.  Rather, appellant was charged by a single information with a series of offenses, all of the "same class of crimes or offenses," which the prosecution argued were "connected together in their commission," and which appellant has never contended were inappropriately joined.  Offenses may be connected together in their commission even though they " 'do not relate to the same transaction and were committed at different times and places [and] against different victims.' [Citations.]" (*Alcala v. Superior Court* (2008) 43 Cal. 4th 1205, 1218.  Further, it is not required that evidence be cross-admissible before jointly charged offenses may be tried together before the same trier of fact. (§ 954.1; *People v. Zambrano* (2007) 41 Cal. 4th 1082, 1129, fn. 10, disapproved on another ground in *People v. Doolin* (2009) 45 Cal. 4th 390, 421, fn. 22.)

As discussed post, we do not agree with Ray Jr.'s contention that modus operandi was the only basis for cross-admissibility of evidence presented or the only manner in which evidence of other crimes was relevant.  Nevertheless, we will assume, without deciding, that not all of the robberies reflected common marks sufficient to establish identity circumstantially, and that if some of the offenses had been separately charged or uncharged, would not be sufficiently "similar" to meet the standards for admissibility.  Evidence of uncharged misconduct is admissible to prove identity when "the uncharged misconduct and the charged offense ... share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts." *(People v. Ewoldt,* supra, 7 Cal. 4th at p. 403; see also *People v. Thornton* (1974) 11 Cal. 3d 738, 756 [overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12; inference depends upon the presence of distinctive "marks" that are "shared by the uncharged and charged crimes"].)

Ray Jr. was on notice, however, from the time of the prosecutor's opening statement that she intended to argue cross-admissibility of the evidence but made no request for a limiting instruction on consideration of the evidence, either during the presentation of the prosecution case or after.  "Under the doctrine of 'limited

admissibility' [citation], certain evidence may be admissible for one purpose or against one party and inadmissible for another purpose or against another party. Because it cannot be excluded, an objection to its admissibility will be futile. Counsel is entitled only to an instruction to the jury, informing them of the limited purpose for which the evidence may be considered, and the fact that it went in without limitation is unappealable unless the instruction was requested. [Citations.]" (3 Witkin, Cal. Evidence (4th ed. 2000) Presentation at Trial, § 382, p. 474.) Evidence Code section 355 provides: "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (Italics added.) Under Evidence Code section 355, a limiting instruction must be requested. If not, it is deemed waived as an appellate issue. (*People v. Boyer* (2006) 38 Cal. 4th 412, 465.) Ray Jr. requested no instruction restricting the jury's consideration of cross-admissibility of evidence to particular factor or factors, and he cannot now complain that the court failed to do so.

Our Supreme Court has held that "[t]he trial court has no sua sponte duty to give a limiting instruction on cross-admissible evidence in a trial of multiple crimes." (*People v. Maury* (2003) 30 Cal. 4th 342, 394; see also *People v. Falsetta* (1999) 21 Cal. 4th 903, 924-925 [no sua sponte duty to instruct the jury as to the admissibility or use of other sex crimes evidence offered under Evidence Code section 1108 and no duty to edit defendant's partially incorrect instruction]; *People v. Collie* (1981) 30 Cal. 3d 43, 64 [no duty to give sua sponte limiting instruction on evidence of uncharged prior assaults on victim].) A narrow exception to this rule has been recognized in the "'occasional extraordinary case in which unprotested evidence of past offenses is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.'" (*People v. Rogers* (2006) 39 Cal. 4th 826, 864 [quoting *People v. Collie, supra*, 30 Cal. 3d at p. 64].) Since the evidence presented here was directly relevant to the legitimate purpose of proving elements of charged offenses, this is not such an "extraordinary case."

Resp. Exh. H at 54-56 (emphasis added).

**B. Legal Standard**

The formulation of jury instructions is a question of state law and is not cognizable in habeas proceedings. *See Estelle*, 502 U.S. at 67-68. A faulty jury instruction will constitute a violation of due process only where the instruction by itself infects the entire trial to such an extent that the resulting conviction violates due process. *See Hendricks v. Vasquez*, 974 F.2d 1099, 1106 (9th Cir. 1992) *citing Cupp v. Naughten*, 414 U.S. 141, 147 (1973). Whether a constitutional violation has occurred will depend upon the evidence in the case and the overall instructions given to the jury. *See Duckett v. Godinez*, 67 F.3d 734, 745 (9th Cir. 1995). Where a given jury instruction is ambiguous, a reviewing court must determine whether there is a "reasonable likelihood" that the jury was misled. *See Murtishaw v. Woodford*, 255 F.3d 926, 967 (9th Cir. 2001).

///

38

**United States District Court**
For the Northern District of California

**C.  Discussion**

Petitioner argues that the court's modification of CALCRIM 3515 deprived him of a fair trial because the instruction, as modified, failed to provide the jury with any guidance as to how to properly consider evidence of other crimes to show identity.  Hab. Pet. at 32-34, Resp. Exh. B at 59.

Petitioner's argument lacks merit.  The state court answered this precise question in the negative, concluding that, under California law, "the trial court has no sua sponte duty to give a limiting instruction on cross-admissible evidence in a trial of multiple crimes."  Resp. Exh. H at 28.  Moreover, there is no clearly established law providing that a state court violates due process by instructing a jury that they may consider evidence that is admissible on other counts to establish pattern, intent, identity, or modus operandi, as cross admissible to establish that person's guilt on other offenses that have been appropriately joined in the same charging document.  Petitioner fails to identify, and the record does not reflect, any instance where the jury may have applied the modified version of CALCRIM 3515 in such a way as to convict Petitioner of offenses based on evidence that was otherwise inadmissible, or upon a lowered standard of proof.  *See Gibson v. Ortiz*, 387 F.3d 812, 822 (9th Cir. 2004) (finding constitutional error where the jury is instructed that they can convict based on a preponderance of the evidence standard) *overruled on other grounds by Byrd v. Lewis*, 566 F.3d 855, 866 (9th Cir. 2009).  Viewed in the context of the jury instructions and the record as a whole, the trial court's giving of CALCRIM 3515 did not violate due process.  *See Estelle*, 502 U.S. at 72.  Accordingly, the state court's decision was not contrary to or an unreasonable application of clearly established federal law, as determined by the United States Supreme Court.  *See* 28 U.S.C. § 2254(d).

**IX.    Sufficiency of the Evidence**

As limited by the court's April 18, 2012 Order, Petitioner challenges the sufficiency of the evidence in counts 2/3, 8/9, 15, 18/19, 20, 22, and 25.  Hab. Pet. at 36-38.

**A.  Legal Standard**

As set forth in Section IV, *supra*, a federal court reviewing a state court conviction does not determine whether the evidence established guilt beyond a reasonable doubt, but determines only "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier

39

of fact could have found the essential elements of the crime beyond a reasonable doubt." *See Jackson*, 443 U.S. at 319.

**B.  State Court Opinion**

The state court, applying the *Jackson* standard, examined the entire record in a light most favorable to the judgment, and determined that, under the totality of the circumstances, the evidence established Petitioner's identity as one of the robbers in the challenged counts.  Resp. Exh. H at 44.

**C.  Discussion**

There was no direct evidence that Petitioner participated in the robberies as to the challenged counts, but the prosecution was able to convince the jury of his guilt through circumstantial evidence. Petitioner argues that this evidence was insufficient to prove his guilt because the crimes did not share a similar modus operandi, and the varying descriptions provided by the victims did not establish his identity as one of the robbers.  Hab. Pet. at 36-38.  In support of his argument, Petitioner notes the following: In counts 2 and 3, the store manager described two of the robbers as black and one as white; in counts 8 and 9, the clerk testified that he thought one of the robbers was white; in count 15, the victim identified one of the two robbers as white by the color of his eyes; in count 20, the store clerk described the two robbers as either white or hispanic; in count 22, the victim stated that one of the two robbers was hispanic or black; and in count 25, the clerk identified both robbers as white based on their speech and the color of the skin around their eyes.  Hab. Pet. at 37-38.

Petitioner's reliance on the victims' inability to consistently identify the race of the robbers is misplaced.  As Petitioner himself notes, the "suspects were unidentifiable because the suspects wore various clothing and disguises," which included hoodies, masks, and bandanas.  Hab. Pet. at 36.  As such, there is no reason that the victims should have been able to conclusively identify Petitioner as one of the robbers.  However, the prosecution was able to present evidence of the similarity between the various robberies without limitation, therefore the jury was able to consider the evidence presented as to all counts in deciding whether a specific count had been proven beyond a reasonable doubt.  Resp. Exh. H at 28.

Based on the totality of the evidence presented at trial, a rational trier of fact could have easily concluded that Petitioner was one of the robbers that committed the offenses described in the

challenged counts.  Petitioner was arrested fleeing from the scene of a convenience store robbery with his son in a stolen Honda, after taking the cash drawer and cigarettes.  Resp. Exh. H at 48.  Petitioner admitted to this robbery and to some others, and inferentially admitted that he knew who was responsible for the other robberies.  *Id.*  The jury also heard evidence that Petitioner attempted to dissuade Carrington from testifying against him, and sought to have his son falsely exculpate him. *Id.*  The robberies were primarily of convenience stores, and the items taken were usually money, cigarettes, and lottery tickets.  *Id.* at 28.  Surveillance footage revealed similar looking men wearing similar clothing in each of the robberies, and Carrington identified Petitioner from surveillance footage as one of the robbers in several of the uncontested counts.  *Id.* at 47-48.  Although the robberies did not share an identical modus operandi, there were sufficient similarities between them to allow a reasonable jury to conclude that Petitioner was one of the robbers that participated in the challenged counts.

Viewing the evidence in the light most favorable to the prosecution, the record supports the conclusion that a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.  *See Herrera-Gonzalez*, 263 F.3d at 1095.  The state court's determination that there was sufficient evidence to support the jury's verdict on the challenged counts was not contrary to, or an unreasonable application of, clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1); *Jackson,* 443 U.S. at 316.

## X.    Involuntary Statements

Petitioner challenges the admission of two sets of statements: (1) statements he made to an Oakland police officer who transported him to the hospital, and later to the police station, following his arrest; and (2) statements made to interviewing officers at the police station.  Hab. Pet. at 40-41.  Petitioner claims that both sets of statements were coerced and obtained in violation of his rights under *Miranda*.  Hab. Pet. at 41.

Petitioner's claim regarding the statements he made to the transporting officer is a restatement of his first claim, which was considered and rejected in Section I, *supra*.  Petitioner's claim regarding the second set of statements is addressed below.

///

41

**A. Factual Background**

Sergeant George Phillips, a robbery investigator for the Oakland Police Department testified at a pretrial hearing on the admissibility of both defendants statements to police. Resp. Exh. B1 at 13-102. Phillips testified that, after their arrest, both defendants were taken to the hospital and treated for their injuries, and then transported to the Oakland Police Department. *Id.* at 20-21, 78. Petitioner was placed in an interview room at 3:00 a.m, but his interview did not begin until 10:57 p.m. *Id.* at 21, 64. In the meantime, Petitioner was allowed to use the restroom, eat, and sleep. *Id.*

Investigators began the interview by eliciting background information from Petitioner before reading him his *Miranda* rights. *Id.* at 95-96. After waiving his *Miranda* rights, Petitioner gave a recorded statement in which he admitted to committing the 7-Eleven robbery for which he was apprehended fleeing the scene, along with his son. *Id.* at 56, 58-59. After the recording was turned off, Petitioner admitted that he was responsible for some, but not all of the other robberies. *Id.* at 61. Shortly after this admission, Petitioner asked for a lawyer. *Id.* at 62. At this point investigating officers stopped all questioning and gathered their materials to leave, but Petitioner kept talking–blaming people in an area where he used to live on Pearl Street in Oakland for some of his actions, and for making his actions look worse than they seemed. *Id.* at 62-63, 99.

Petitioner testified that investigating officers began the interview by informing him that he was under arrest for robbery and was a suspect in numerous other robberies in Oakland. *Id.* at 117. However, other than the 7-Eleven robbery in which he was apprehended with his son, Petitioner denied telling investigators that he was involved in any of the other robberies, and did not admit to making any statements after invoking his right to counsel. *Id.* at 119-121.

The trial court noted that there was no issue with regard to the *Miranda* admonition itself. *Id.* at 129. The court went on to find that the statements made by Petitioner, both before and after the invocation of his right to counsel, were all admissible because the earlier statements were made while the *Miranda* waiver was in effect, and the latter statements were spontaneous remarks that were not made in response to interrogation. *Id.* at 129.

///

42

**B. Legal Standard**

The requirements of *Miranda* are set forth in Section I B., *supra*, and are "clearly established" federal law for purposes of federal habeas review under 28 U.S.C. § 2254(d).  *See Juan H.,* 408 F.3d at 1271; *Jackson,* 364 F.3d at 1009.

**C. Discussion**

Petitioner contends that his statements were rendered involuntary because investigating officers exerted "psychological pressure" by holding him in an interview room for "at least 20 hours" before reading him his *Miranda* rights, and keeping  him "incommunicado and isolated from family, friends, and his lawyer." Resp. Exh. N, Hab. Pet. at 40.  Petitioner's claim lacks merit.  In cases involving psychological coercion, "the pivotal question ... is whether, in light of the totality of the circumstances, the defendant's will was overborne when the defendant confessed."  *See Ortiz v. Uribe*, 671 F.3d 863, 869 (9th Cir. 2011) (citations, quotations omitted).  Although Petitioner was detained for close to 20 hours before he was interviewed,  the record reflects that he was taken to the bathroom 14 times, allowed to sleep, and was given food and water during that time.  Resp. Exh. B1 at 64.  Aside from background questions, no interrogation took place prior to *Miranda* warnings being given.  Resp. Exh. B1 at 95-96.  Once Petitioner invoked his right to counsel, investigators ceased all questioning, and the subsequent statements made by Petitioner were spontaneous and unprompted, and not the product of interrogation. *Id.* at 62-63.  Based on the totality of the circumstances, Petitioner's will was not overborne when he made the statements to investigating officers.  *See Uribe*, 671 F.3d at 869.

After an independent review of the record, the court finds that the state court decision denying Petitioner's challenge to the admission of his statements was not objectively unreasonable.  *See Delgado*, 223 F.3d at 982.

**XI.   Cruel and Unusual Punishment**

Petitioner claims that his sentence of 38 years and 4 months constitutes cruel and unusual punishment.  Hab. Pet. at 42.  The Court of Appeal found that Petitioner forfeited this argument by failing to raise it on direct appeal.  Resp. Exh.L at 1.  Notwithstanding Petitioner's failure to raise the issue on direct appeal, the court will exercise its discretion and reach the merits of his claim.  *See*

*Boyd,* 147 F.3d at 1127.

### B. Legal Standard

Outside of the capital punishment context, the Eighth Amendment prohibits only sentences that are extreme and grossly disproportionate to the crime. *See United States v. Bland*, 961 F.2d 123, 129 (9th Cir. 1992) *quoting Harmelin v. Michigan*, 501 U.S. 957, 1001 (1991). Such instances are "exceedingly rare" and occur in only "extreme" cases. *See Lockyer v. Andrade*, 538 U.S. 63, 72-73 (2003); *Rummel v. Estelle*, 445 U.S. 263, 272 (1980). So long as a sentence does not exceed statutory maximums, it will not be considered cruel and unusual punishment under the Eighth Amendment. *See United States v. Mejia-Mesa*, 153 F.3d 925, 930 (9th Cir. 1998).

### C. Discussion

Petitioner contends that, in light of his relatively minor criminal history, his sentence is cruel and unusual in that he will serve 32 years in prison before he will become eligible for parole. Hab. Pet. at 42.

Petitioner's claim lacks merit. Although he received a severe sentence, "outside the context of capital punishment, successful challenges to the proportionality of particular sentences will be exceedingly rare." *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) *quoting Solem v. Helm*, 463 U.S. 277, 289-90 (1983). Here there is no basis for finding that Petitioner's sentence is grossly disproportionate to his offense. Petitioner was convicted of 21 counts of robbery with enhancements for use of a firearm and inflicting great bodily injury. Over a period of over 13 months, Petitioner and his family engaged in a violent crime spree robbing a variety of establishments in the East Bay, that only came to an end following a dangerous, high speed chase with Oakland police officers while fleeing the scene of their last robbery. Petitioner occupied a position of leadership and exerted a great deal of influence over the other participants, which included his son and his daughter–both minors. The trial court properly weighed the aggravating and mitigating factors before sentencing Petitioner to a term of imprisonment that was within the statutory maximum. Resp. Exh. B9 at 1480-81. The aggregate of the consecutive sentences imposed was 67 years. Based upon Penal Code section 1170.1(a), one-third of those 67 years was imposed to be served consecutive to the sentence imposed on Count 22 for a total term of 38 years and 4 months.

Under these circumstances, Petitioner's claim that his sentence constitutes cruel and unusual punishment fails, regardless of whether it is procedurally barred.

### CONCLUSION

For the foregoing reasons, the Court DENIES the Petition for Writ of Habeas Corpus as to all claims. A certificate of appealability will not issue. Reasonable jurists would not "find the district court's assessment of the constitutional claims debatable or wrong." *See Slack v. McDaniel*, 529 U.S. 473, 484 (2000). Petitioner may seek a certificate of appealability from the Court of Appeals. The Clerk shall enter judgment in favor of Respondent and close the file.

IT IS SO ORDERED.

DATED: June 6, 2013

YVONNE GONZALEZ ROGERS
UNITED STATES DISTRICT COURT JUDGE

United States District Court
For the Northern District of California